Jeff **QUON, Jerilyn Quon, April Florio, Doreen Klein, and Steve Trujillo,** Plaintiffs,

v.

**ARCH WIRELESS OPERATING COMPANY, INC.; City of Ontario; Ontario Police Department; Lloyd Scharf, and Debbie Glenn, Defendants.**

**No. EDCV 03–199 SGL.**

United States District Court, C.D. California.

Aug. 15, 2006.

Anthony Michael Snodgrass, Lackie & Dammeier, Michael David Lackie, Lackie & Dammeier, Michael A. Morguess, Lackie & Dammeier, Upland, CA, for Jeff Quon, Jerilyn Quon, April Florio, Doreen Klein,

Steve Trujillo, Roes 1 through 20 inclusive, Plaintiffs.

James L. Poth, Jones Day, Irvine, Jason Alan Cole, Schaffer Lax McNaughton and Chen, Los Angeles, CA, Richard J. Grabowski, Jones Day, Irvine, Stephen A. Lax, Schaffer Lax McNaughton & Chen, Los Angeles, CA, Dimitrios C. Rinos, Rinos & Martin, Laura L. Stephan, Rinos & Martin, Tustin, Bruce E Disenhouse, Kinkle Rodiger & Spriggs, Riverside, CA, for Arch Wireless Incorporated a Delaware Corporation, Ontario City of A Municipal Corporation, Lloyd Scharf Individually ans as Chief of Ontario Police Department, Debbie Glenn Individually and as a Sergeant of Ontario Police Department, Does 1 through 10 Inclusive, Defendants.

AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT[1]

LARSON, District Judge.

What are the legal boundaries of an employee's privacy in this interconnected, electronic-communication age, one in which thoughts and ideas that would have been spoken personally and privately in ages past are now instantly text-messaged to friends and family *via* hand-held, computer-assisted electronic devices? It is precisely this question that is before the Court in the form of plaintiffs' motions for summary judgment and defendants' cross-motions for summary judgment. After reviewing the pleadings and listening to the parties' oral arguments at multiple hearings on the instant motions, the Court, for the reasons set forth below, **GRANTS IN PART** and **DENIES IN PART** defen- dants' motions for summary judgment and **DENIES** plaintiffs' motions for summary judgment.

Given that the applicable legal standard for considering such motions has long past become firmly established, the Court will only briefly remind the reader: Summary judgment can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law; in determining whether these conditions are met the record must be viewed in the light most favorable to the party opposing the motion, with the court indulging in all inferences favorable to that party. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995).

This case has its genesis in gross malfeasance which, no one disputes, took place in the Ontario Police Department's dispatch center in the early part of this decade. Sally Bors, a dispatcher, was under investigation in September, 2002, for providing information to her boyfriend Mark Timbrell, who was a member of the Hell's Angels motorcycle gang, regarding police investigative activity about the Hell's Angels in general and Timbrell in particular. A sting operation was performed to ferret out this corruption on September 16, 2002. A narcotics officer called in the license plate of a known Hell's Angels member to Bors. Rather than contacting the Hell's Angels member directly, Bors used her pager to text message another dispatcher, Angela Santos, requesting that she contact the Hell's Angels member and let him know he was being followed by a narcotics agent. After doing so, Santos immediately

---

1. The Court vacates the order of March 9, 2006, concerning some of the parties' motions for summary judgment. Since that time, the parties have filed a second round of summary judgment motions. This amended order addresses all of the parties' summary judgment motions.

contacted yet another dispatcher, April Florio, and informed her of what she had done for Bors. Florio then contacted fellow dispatcher Doreen Klein about Bors/Santos' activities. Neither Florio nor Klein reported this malfeasance to any personnel, supervisory or otherwise, in the police department.

When Klein and Florio arrived at the dispatch center the following day, they were asked to report to their supervisor's office to answer some questions. When they arrived in the supervisor's office, internal affairs Sergeant Deborah Glenn asked them to hand over their personal cell phones and pagers before the questioning would commence. Two weeks earlier the department had issued a memorandum to those working in the dispatch center that, "[e]ffective immediately and until further notice, use of all cell phones and pagers within the Dispatch Center will be prohibited. On duty personnel shall leave pagers and cell phones in their lockers and check them on their breaks." (Joint Defs. Exhibits in Support Mot. Summ. J., Ex. EE). The pagers and cell phones were kept on a table in an interrogation room where Florio and Klein were separately interviewed by internal affairs personnel. The reason proffered for the seizure of the duo's personal pagers and cell phones was to "preclude [them] ... from covertly communicating with one another before, during, or after each of their interviews" so they could not coordinate their stories. (Defs' Mot. Summ. J. at 43; Pls' Index of Exhibits in Opp., Ex. G at 44). The pagers and cell phones were apparently returned to Klein and Florio following the interrogation. Florio and Klein alleged that during the interrogation, Sergeant Glenn examined and read information contained on their cell phones and pagers, including text messages, names, phone numbers, and street addresses. (Second Am. Compl. ¶ 72). This allegation in the complaint, however, was never confirmed during the subsequent discovery conducted in this case.

Klein, Florio, and Santos were each interviewed in turn by internal affairs personnel. During their interviews, Klein and Florio "played dumb" with respect to the malfeasance in the dispatch center. When Santos was interviewed, however, she confessed to her involvement, informing internal affairs personnel that, at the behest of Bors, she had contacted a Hell's Angels member and advised him that he was being followed by police, and that she also relayed that information to Florio.

On the next day, September 18, 2002, Florio and Klein were re-interviewed by internal affairs personnel. Only when confronted with Santos' confession did each in turn acknowledge that they too were aware that Santos had contacted a Hell's Angels member to inform him that he was being followed by the police. Klein and Florio were later terminated from their positions on account of their misconduct.

In the midst of these developments, a separate event took place that would later become embroiled in the dispatch center investigation. The event involved the department's audit of the text messages sent to and sent from police sergeant Jeff Quon's city-issued pager for the period of August 1 to September 30, 2002. The connection between the Quon pager audit and the Bors investigation arises in part from the fact that, at the time, Jeff Quon, who was married to Jerilyn Quon, another Ontario police officer, was having an extramartial affair with Florio. Some prefatory remarks at this point concerning the city-issued pagers is warranted.

In October, 2001, the City of Ontario entered into a contract with Arch Wireless Operating Company, Inc. ("Arch Wireless"), subscribing for the provision of two-way alphanumeric text-messaging pagers for its employees as well as other wireless

communication services incident to the use of such pagers. As part of the contract, the City paid Arch Wireless a monthly subscription rate keyed to each pager being allotted 25,000 characters—be it letters, numbers, or other symbols—per month, with the City having to pay extra for any overages. The City issued such a pager to members of the police department's SWAT team, which included plaintiffs Jeff Quon and Steve Trujillo, both of whom were sergeants with the City's SWAT team. The issuance of such city-owned pagers to members of the SWAT team was meant to enable better coordination and a more rapid and effective response to emergencies by providing nearly instantaneous situational awareness to the team as to the other members whereabouts.

Text messages sent on the pagers operate as follows over the Arch Wireless network:

The message leaves the originating pager via a radio frequency transmission. That transmission is received by any one of many receiving stations, which are owned by Arch Wireless. Depending on the location of the receiving station, the message is then entered into the Arch Wireless computer network either by wire transmission or via satellite by another radio frequency transmission. Once in the Arch Wireless computer network, the message is sent to the Arch Wireless computer server. Once in the server, a copy of the message is archived. The message is also stored in the server system, for a period of up to 72 hours, until the recipient pager is ready to receive delivery of the text message. The recipient pager is ready to receive delivery of a message when it is both activated and located in an Arch Wireless service area. Once the recipient pager is able to receive delivery of the text message, the Arch Wireless server retrieves the stored

message and sends it, via wire or radio frequency transmission, to the transmitting station closest to the recipient pager. The transmitting stations are owned by Arch Wireless. The message is then sent from the transmitting station via a radio frequency transmission, to the recipient pager where it can be read by the user of the recipient pager.

(Decl. Steven Niehamp ¶¶ 3–7).

As part of its provision of *computer* desktop equipment to its personnel, the Ontario police department had all of its employees review and sign a written statement of the department's policy concerning use of this equipment. The statement, entitled "Computer Usage, Internet and E-mail Policy," states that the department's policy encompasses "[t]he use of any City-owned computer equipment, computer peripherals, City networks, the Internet, e-mail services or other City computer related services." The policy itself is outlined as follows:

C. Access to all sites on the Internet is recorded and will be periodically reviewed by the City. The City of Ontario reserves the right to monitor and log all network activity including e-mail and Internet use, with or without notice. Users should have no expectation of privacy or confidentiality when using these resources.

D. Access to the Internet and the e-mail system is not confidential; and Information produced either in hard copy or in electronic form is considered City property. As such, these systems should not be used for personal or confidential communications. Deletion of e-mail or other electronic information may not fully delete the information from the system.

E. The use of inappropriate, derogatory, obscene, suggestive, defamatory, or harassing language in the e-mail system will not be tolerated.

(Joint Defs' Exhibits Mot. Summ. J., Ex. M at 2). Jeff Quon received a copy of this written policy and signed a form acknowledging he had reviewed and understood the policy on March 18, 2000, a full two-and-a-half years before the events in question in this case arose. (Joint Defs' Exhibits Mot. Summ. J., Ex. L).

After the provision of city-owned pagers to SWAT team members sometime toward the end of 2001 or the beginning of 2002, the department's supervising personnel made statements concerning its use vis-à-vis the department's computer usage policy to the staff in general and to Jeff Quon in particular. At a supervisory staff meeting on April 18, 2002, at which Jeff Quon was present, the person in charge of the use and provision of the department's electronic equipment, Lieutenant Steven Duke, reminded those in attendance that "two-way pagers are considered e-mail messages. This means that messages would fall under the City's policy as public information and eligible for auditing." (Joint Defs' Exhibits Mot. Summ. J., Ex. N). This statement was later memorialized in a memorandum sent to all supervisory personnel, including Jeff Quon and Steve Trujillo.

Lieutenant Duke's representation that the department could audit the pagers was not entirely accurate. The department's supervisory staff itself did not have the ability to review the contents of the text messages sent or received by the pagers issued to its employees. (Pls' Index Exhibits Opp., Ex. D at 23). Supervisory staff could not access what transpired over the pagers from their own computers, nor could they log onto Arch Wireless' network from their computers at work to do the same. Instead, to review the contents of the text message sent or received from one of the city-owned pagers, supervisory staff had to contact an Arch Wireless representative and request for them to generate a copy of the transcripts of those messages. (Pls' Index Exhibits Opp., Ex. D at 36).

Insofar as overage charges, it appears that the department—through the actions of Lieutenant Duke—had an unstated policy of agreeing *not* to audit the use of the pagers whenever overages existed so long as the personnel in question paid the department for the overage. Only when the personnel in question disputed the overages—either claiming that the use was work-related or otherwise—did Lieutenant Duke make it clear that he would endeavor to audit the contents of the messages sent and received on the pager. As Lieutenant Duke commented, "[W]e would usually call the employee and say, 'Hey, look, you're over X amount of characters. It comes out to X amount of dollars. Can you write me a check for your overage." (Pls' Index Exhibits Opp., Ex. D at 13). Lieutenant Duke relayed this unwritten policy regarding the conditions under which an audit of a pager would take place for overages to Jeff Quon.

Within the first or second billing cycle after the pager was issued to Quon, Lieutenant Duke approached him because Quon had exceeded his maximum number of allotted characters. Lieutenant Duke, during this conversation, told Quon that the text messages sent over the City-owned pager "were considered e-mail and could be audited." (Pls' Index Exhibits Opp., Ex. M at 4). Lieutenant Duke, however, went on to say "that it was not his intent to audit employee's text messages to see if the overage is due to work related transmissions." (Pls' Index Exhibits Opp., Ex. D at 69). Instead, Quon "could reimburse the City for the overage so he would not have to audit the transmission and see

how many messages were non-work related." (Pls' Index Exhibits Opp., Ex. D at 69). Such an approach was Lieutenant Duke's generous way of streamlining administration and oversight over the use of the pagers because, as he reminded Quon, he could, "if anybody wished to challenge their overage, ... audit the text transmissions to verify how many were non-work related." (Pls' Index Exhibits Opp., Ex. M at 4). As Lieutenant Duke explained in his deposition: "[W]hat I told Quon was that he had to pay for his overage, that I did not want to determine if the overage was personal or business unless they wanted me to, because if they said, 'It's all business, I'm not paying for it,' then I would do an audit to confirm that. And I didn't want to get into the bill collecting thing, so he needed to pay for his personal messages so we didn't—pay for the overage so we didn't do the audit." (Pls' Index Exhibits Opp., Ex. D at 70).

Lieutenant Duke testified that this practice ended in August, 2002, when he made it known at a meeting with Chief Lloyd Scharf that he had grown "tired of being a bill collector with guys going over the allotted amount of characters on their text pagers." (Pls' Index Exhibits Opp., Ex. N at 15). The police chief remembered Lieutenant Duke complaining at the meeting that "some members ... were killing trees in the overages. There was a lot of overages." (Defs' Additional Exhibits in Support, Ex. A at 7). Lieutenant Duke stated that Chief Scharf responded to his complaint by asking him to audit "the transcripts to make a determination whether they had personal use versus—overage or increase the amount of characters, plus—so we just kind of stopped the practice." (Pls' Index Exhibits Opp., Ex. D at 55). In other words, according to Lieutenant Duke, the efficacy of the established monthly character limits was the main impetus for Chief Scharf's ordering the audit.

Another individual, Patrick McMahon, recalled the discussion somewhat differently, suggesting that the main impetus was a concern over using department equipment for personal purposes: "The chief said—or had asked [Duke] if these can be audited to see if these are work-related, and if so work-related, then obviously they're not an issue. However, if they're not work-related, that he wanted that looked into and addressed as to why people are using the pagers in excess of the amount of monthly characters that were allowed." (Pls' Index Exhibits Opp., Ex. N at 15). This latter recollection of the substance of the meeting was confirmed by Chief Scharf in his deposition: "I asked [Lieutenant Duke] to pull the top two and determine if they were used on duty or for off duty. My concern was—that it was work-related. I didn't want someone playing games or—on company time." (Defs' Additional Exhibits in Support, Ex. A at 8). Chief Scharf acknowledged knowing of Lieutenant Duke's unstated policy of allowing the use of pagers for personal matters when he ordered him to do the audit in question, and he was also aware that the two officers whose pager transcripts he was ordering to be audited had already paid for their overages for the period under review. (Defs' Additional Exhibits in Support, Ex. A at 8). As relayed by Chief Scharf, these points were not material to him in deciding to go forward with the audit:

Q. ... on what basis did you believe that the messages could be pulled or reviewed for the top two officers?

A. It was a work-related issue. It was work-related equipment. On that basis, I believed I had access to them.

(Defs' Additional Exhibits in Support, Ex. A at 11).

At the conclusion of this meeting, Chief Scharf ordered Lieutenant Duke to pull

the transcripts for the text messages sent on the two officers' pagers for the period of August to September, 2002, and review the contents of the pager transmissions to "[d]etermine if the usage was on duty or off duty." (Defs' Additional Exhibits in Support, Ex. A at 12). If the messages sent on the pagers while the officers were on duty were not work-related, Chief Scharf expressed concern "that someone was wasting a lot of City time conversing with someone about non-related work issues." (Defs' Additional Exhibits in Support, Ex. A at 12). Chief Scharf appeared rather unconcerned when pressed whether such an audit may uncover personal information about the officers in light of Lieutenant Duke's unstated policy that was in effect during the time those transmissions were made allowing officers to use the pagers for personal, non-worked related reasons:

> Q. ... Did you give at that time any consideration to the fact that the text messages may contain personal messages or paging text from people not employed by the City of Ontario?
>
> A. No.
>
> Q. You say you didn't think about it one way or the other?
>
> A. That's correct.

(Defs' Additional Exhibits in Support, Ex. A at 12).

In tasking Lieutenant Duke with auditing the pagers, Chief Scharf did not consider whether there was a less intrusive means of conducting the audit; for instance, Chief Scharf did not consider whether it was advisable to have the text messages reviewed, if at all, in redacted form (*i.e.,* with messages sent or received on off-duty hours redacted to protect Quon's privacy interests). Specifically, when asked whether he considered asking Lieutenant Duke to perform the audit just by reviewing the billing records for the pagers, as opposed to the text transmissions themselves, Chief Scharf responded: "I don't think you could do that, but I don't recall doing that." (Defs' Additional Exhibits in Support, Ex. A at 39).

In performing the audit it was determined that the two employees' pagers that exceeded the character limit for the billing period following this change in policy were Jeff Quon and another officer, Glisson, who is not a party to this case. The department's contact person requested from Arch Wireless the transcripts for the two pagers during the billing period in question—August 1, 2002, to September 31, 2002. The Arch Wireless representative confirmed that the pagers were owned by the City and that the request came from the designated contact person. After satisfying itself of these two points, Arch Wireless provided transcripts of the contents of the messages sent and received by the pagers during the time in question.

The transcripts for Quon's pager tallied forty-six pages in length. Lieutenant Duke reviewed the transcripts. Many of the text messages sent and/or received by Quon's pager while he was on-duty were, to say the least, sexually explicit in nature. Some of these messages were directed to or from his wife, Jerilyn Quon, while others were directed to or from his mistress, Florio. Other messages, while not sexually explicit were nonetheless private, were sent to and received from his co-worker, Trujillo. When Lieutenant Duke reported the results of his audit to Chief Scharf a few weeks later, Chief Scharf decided that he and Quon's supervisor, Lieutenant Tony Del Rio, should review some of the transcripts themselves. (Defs' Additional Exhibits in Support, Ex. A at 16, 39). When asked whether he felt uncomfortable reviewing such private messages, Chief Scharf seemed puzzled for the basis of the question, stating that "[i]t was of no con-

cern to me as far as the nature of the text. The concern to me was was it [work]-related occurring on duty." (Defs' Additional Exhibits in Support, Ex. A at 16). Chief Scharf thereafter made a determination that Quon's pager was being misused in that "[t]oo much duty time was used for personal pages not associated with duty on duty time." (Defs' Additional Exhibits in Support, Ex. A at 35).

The matter was thereafter referred to internal affairs in October, 2002, for an investigation "to determine if someone was wasting ... City time not doing work when they should be," which could be potential grounds for misconduct for not paying attention to duty. (Defs' Additional Exhibits in Support, Ex. A at 42–43; Pls' Supplemental Evidence in Support, Ex. B at 59). When asked why an internal affairs investigation was needed (as opposed to just telling Quon to stop using his city-owned pager for personal use), Chief Scharf responded that an investigation was needed to be fair and to determine if the personal use of the pager occurred while Quon was on-duty. (*Id.*). The internal affairs investigation into Quon was thereafter turned over to Sergeant Patrick McMahon. (Patrick McMahon Aff. ¶ 3).

Sergeant McMahon began the investigation by asking Quon whether he could vouch for how much of his on-duty time was spent using the pager for work-related reasons. (Patrick McMahon Aff. ¶ 4). Quon "indicated that he could not state how much time he spent on the pager during work hours." (*Id.*). Given this response, using Quon's time sheets, Sergeant McMahon took the transcripts and redacted with a black marker those portions that were transmitted while Quon was off-duty. (Patrick McMahon Aff. ¶¶ 3–5). Given the amount of pages in the transcripts, Sergeant McMahon enlisted the aid of another member of internal affairs, Sergeant Glenn, to make the redac-

tions. (Patrick McMahon ¶ 4; Def. Glenn Supplemental Submission, Ex. A at 13, 62, 77). While performing these redactions, Sergeant Glenn did more than simply note the time entries and use her marker—it is alleged that she also jotted down the pager numbers the text messages were sent to and received from on Quon's pager and, on at least one occasion, dialed the pager number in question, which happened to belong to Quon's wife, Jerilyn Quon. (Pls' Supplemental Evidence in Support, Ex. B at 64–65, 67; Decl. Jerilyn Quon ¶¶ 3–5).

About the same time that the department obtained a transcript of Quon's text messages, Lieutenant Duke conversed with Sergeant Glenn, who was in the midst of conducting the investigation into the above-described corruption at the dispatch center. At some point during this conversation, Sergeant Glenn informed Lieutenant Duke that she "would like to review [the transcripts] after they were dealt with," and that in particular, she "wanted to review messages between [Jeff] Quon and ... I believe it was April Florio." (Pls' Index Exhibits Opp., Ex. D at 46). No evidence, however, suggests that the transcripts were ever used in the dispatch center investigation. (Def. Glenn Supplemental Submission, Ex. A at 13, 23, 32).

The final event to this rather sordid tale inside the Ontario Police Department concerns Jerilyn Quon's effort to find employment elsewhere after the above events transpired. In January, 2003, Jerilyn Quon applied for a position as a police officer with the City of Upland. Her interview with then Upland Police Chief Martin Thouvenell on February 11, 2003, apparently went so well that she was told the job was hers and she was sent downstairs immediately afterwards to begin filling out paperwork. Chief Thouvenell cautioned Jerilyn as she was leaving the interview that he had one more interview

for the position with a person within the Upland police department. A week and a half later, on February 17, 2003, Jerilyn received a letter dated February 12, 2003, informing her that she did not get the job, but that it was being filled by a person in-house. Jerilyn, apparently borne by her perception of how well her interview had gone, doubted the veracity of this explanation. Instead, she became convinced that the reason she was turned down for the position was because Chief Scharf called Chief Thouvenell and informed him that Jerilyn was suing him in the instant matter for the divulgence of the text messages from her husband's pager.

Plaintiffs then filed the instant suit on February 25, 2003, against Arch Wireless, and a host of governmental entities and employees—the City of Ontario, the Ontario Police Department, its Chief of Police, Lloyd Scharf, and Sergeant Glenn (hereinafter "governmental defendants")—asserting federal claims for violations of the Stored Communications Act and the Fourth Amendment, and state law claims for violations of the California constitution, California Penal Code section 629.86, invasion of privacy, and defamation.

### A. STORED COMMUNICATIONS ACT

In 1986, Congress passed the Electronic Communications Privacy Act ("ECPA") "to afford privacy protection to electronic communications" by amending Title III to the Omnibus Crime Control and Safe Streets Act of 1968 (also known as the federal Wiretap Act), which up to that point had only provided statutory protection to landline "wire and oral communications." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir.2002). As part of this package of statutory measures to provide some protection to electronic communications, Congress enacted as Title II to the ECPA the Stored Communications Act ("SCA"), which as its name implies was "designed to 'address[ ] access to stored

wire and electronic communications and transactional records.'" *Id.* Towards that end, the SCA prohibits any "person or entity providing" either "an electronic communication service" or a "remote computing service" to "the public" from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service," or "divulg[ing] a record or other information pertaining to a subscriber or customer of such service." 18 U.S.C. § 2702(a). To fulfill the promise these statutory protections were meant to afford, Congress allowed a private right of action to any "person aggrieved by any violation of this chapter." 18 U.S.C. § 2707(a). The Ninth Circuit has noted that, given the statute's age, preceding as it did the mass use of the Internet and the world wide web, its framework at times is "ill-suited to address modem forms of communication," often-times requiring courts to "struggle[ ] to analyze problems involving modem technology within the confines of this statutory framework, often with unsatisfying results." *Konop*, 302 F.3d at 874. Such a clash of technology and the current state of the law takes center stage in this case.

To begin, it is doubtful that any of the governmental defendants as they are currently charged in the complaint can be held liable for a violation of the SCA. None would fall within section 2702(a)'s prohibition as they do not provide any type of electronic service to the public. At best, some were involved in *requisitioning* such service to be provided to their employees from Arch Wireless. This factual circumstance is far removed from what lies at the heart of section 2702's prohibitions, where it is even debatable whether an online retailer is subject to section 2702. *Compare Dyer v. Northwest Airlines Corps.*, 334 F.Supp.2d 1196 (D.N.D.2004)(holding that ECPA does not "encompass businesses selling traditional

products and services online"); *Andersen Consulting LLP v. UOP*, 991 F.Supp. 1041 (N.D.Ill.1998)(same) *with United States v. Mullins*, 992 F.2d 1472, 1478 (9th Cir.1993)(summarily holding without analysis that an airline, through its computerized reservation system, was an electronic communications service provider). Here, the governmental defendants' linkage to the electronic service in question is even more tenuous—they provide no electronic services themselves, but purchase the same from a third party, Arch Wireless, who in turn provides a service to the governmental defendants' employees. Holding that the governmental defendants are service providers would stretch the ECPA too far.[2]

■ Plaintiffs seek to ameliorate this defect by arguing that the governmental defendants should be held liable under section 2703(a), which sets precise limits on a governmental entity's attempt to "require the disclosure by" a service provider "of the contents of a wire or electronic communication" that "is in electronic storage." Reliance on that statutory provision is misplaced. Section 2703 concerns a governmental entity's attempt to gain information in electronic storage *during the course of a criminal investigation*. This criminal investigation nexus is manifested by section 2703's reference to the need for a grand jury or administrative subpoena before an electronic communication in storage may be divulged, functions associated with ongoing criminal investigations. *See* 18 U.S.C. § 2703(b)-(c). Removing all doubt

on this point is the section's call for a showing from the government entity that such disclosure is "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Other courts, including the Ninth Circuit, have similarly commented on the criminal investigation nexus to section 2703's prohibitions. *See Konop*, 302 F.3d at 879 ("Section 2703(a) of the SCA details the procedures *law enforcement* must follow to access the contents of stored electronic communications, but these procedures are considerably less burdensome and less restrictive than those required to obtain a wiretap order under the Wiretap Act" (emphasis added)); *see also United States v. Councilman*, 373 F.3d 197, 208–09 (1st Cir.2004)(remarking on section 2703 being the law enforcement counterpart to the Wiretap Act's protections contained in section 2518)(Lipez, J., dissenting), *overruled by* 418 F.3d 67 (1st Cir.2005)(en banc). Section 2703 has no application to an employer, who happens to be a governmental agency, in its effort to manage its own workforce by auditing the electronic equipment provided to its employees to determine whether they have engaged in workplace malfeasance.

This Court accordingly holds that the governmental defendants do not fall within the statutory prohibitions contained in section 2702(a), that section 2703 has no application to the facts of this case, and, therefore, those defendants are not liable under the Act for any disclosure of the contents of the text messages received or transmitted from Jeff Quon's pager.[3] This then

---

2. To the extent the governmental defendants would qualify, one of the exceptions to the statute's prohibition—divulgence to the subscriber by a remote computing service, as the Court discusses below *vis-à-vis* Arch Wireless—would apply, thus further absolving the governmental defendants of liability.

3. Nowhere in their complaint have plaintiffs alleged, nor in their pleadings have they argued, that the governmental defendants

should be held liable under section 2707 for aiding and abetting a violation of the statute. *See In re American Airlines, Inc. Privacy Litigation*, 370 F.Supp.2d 552, 556 n. 10 (N.D.Tex.2005)(assuming arguendo that such aiding and abetting liability is possible under the statute). Liability is premised solely on the governmental defendants being a principal in the violation of the statute, hence the plaintiffs' citation to section 2703's prohibi-

leaves the service provider's exposure under the statute.

■ Arch Wireless has invoked a statutory defense contained in the SCA that allows for the disclosure of the contents of an electronic communication held in electronic storage when it is done "with the lawful consent of the originator or an addressee or intended recipient of such communication [in the case of an electronic communication service], or the subscriber in the case of remote computing service." 18 U.S.C. § 2702(b)(3). Arch Wireless argues that it falls within this exception as it provided a remote computing service and divulged the contents of the text messages on the pager to the subscriber of that service, the City of Ontario. No dispute exists that the City was a subscriber under the statute. What is disputed is whether the service provided by Arch Wireless— that is, of being able to retrieve for its subscribers text messages that have been sent over its communication network and are held in long-term electronic storage on its computers—constitutes a *remote computing service* or, rather, is more properly characterized as an *electronic communication service*. If the former, then the City's consent would serve to absolve Arch Wireless of liability as it was the subscriber to the service. If the latter, then the City's consent is to no avail as only the consent of the originator or intended recipient of such a message (in this case, the plaintiffs themselves) would suffice for the exception to apply.

A remote computing service is defined by the statute as "the provision to the public of computer storage or processing services by means of an electronic communication system." 18 U.S.C. § 2711(2). The term "electronic communication system" referenced in the definition in turn

means, among other things, "any computer facilities or related electronic equipment for the electronic storage of such [electronic] communications." 18 U.S.C. § 2510(14). By way of comparison, an electronic communications service is labeled as one "which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

The service Arch Wireless provides allegedly meets the statutory definition for a remote computing service as it stored the contents of text messages on its computer—the "computer storage" spoken of in the statute—utilizing Arch Wireless' computer network *via* wire and/or radio facilities—the "electronic communication system" noted in the statute. To that end, Arch Wireless compares what it provided to the City of Ontario to that of e-mail, a comparison which the governmental defendants have made both before and after the litigation in this case ensued. The comparison to e-mail is predicated upon Arch Wireless providing long-term storage on its computer network of the text messages sent and received on the City-owned pagers utilizing its communication network. (Def. Arch Wireless Reply at 1 (noting that "opened e-mail that remains on an electronic communications service provider's system after transmission and receipt be covered by the provisions of the statute relating to 'remote computing services.' ... Here, the messages sent to Jeff Quon's city-owned pager had already been 'opened' and read by Jeff Quon at the time the pager transcripts were requested by the City. As such, ... Arch was providing a 'remote computing service' and the statutory exception to liability should apply to Arch")). That Arch Wireless would at-

---

tion against acts directly committed by law enforcement in seeking the contents of stored

electronic files.

tempt to make such a comparison is understandable given that e-mail is mentioned repeatedly in conjunction with a remote computing service in the legislative history surrounding the passage of the SCA. *See* H.R. RPT. No. 99–647, at 64–65 (1986), S. RPT. No. 99–541, at 3.

The comparison, however, is not a perfect fit. As Mr. Niehamp's declaration makes clear, a message carried over the Arch Wireless network is archived on the company's computer for long-term storage where it can be retrieved later by *company personnel* at the request of the pager's subscriber, in this case the City of Ontario. While this may have the same end result as an e-mail service, in the sense that a message can be recalled that is stored in a third-party's computer network, there is a notable difference. None of the "e-mailed" text messages stored on Arch Wireless' network could be directly retrieved or re-accessed by the subscriber or user after having been opened as is the case with traditional e-mail. Rather, such retrieval occurs only with the assistance of Arch Wireless personnel who, at the behest of the subscriber or user, access the company's network and generate paper copies of the text messages in question that in turn is sent to the customer. Arch Wireless' service therefore cannot be thought of as being e-mail. The question thus becomes whether this direct accessibility feature associated with traditional e-mail is a component necessary for a service to be considered a remote computing service, and, if not, whether the distinctions that do exist in the statute make the service provided by Arch Wireless more akin to a remote computing service or not.

Plaintiffs argue that such inter-connectivity is mandated, claiming that for something to qualify as a remote computing service subscribers must be able to directly access the stored messages on their own without the need for the intervention on the part of the service' providers' personnel. Nothing in the statute's text requires such a direct accessibility component to the service. Again, the statute's definition provides that for something to be considered a remote computing service it need only provide "computer storage or processing services" to the public by utilizing "computer facilities or related electronic equipment." Nowhere does the definition cabin itself to who or how that computer system is accessed. Rather, it allows equally for a computer system that is simply located at an off-site facility separate from the subscriber's work site to suffice as it does for one that also provides for a remote access to that computer system by subscribers of the service. That being said, defendants do acknowledge that reference to the statutory text is "nebulous" as to the accessibility argument. (Def. Arch Wireless's Reply at 1).

To assist the Court in answering this question the parties have brought to the Court's attention a district court opinion that, it is asserted, "construed" the statutory language at issue. *See Steve Jackson Games, Inc. v. United States Secret Service,* 816 F.Supp. 432 (S.D.Tex.1993). That court's opinion was long on conclusion but short on substance. There the court simply declared, without analysis, that the computer system in that case "was a 'remote computing service,'" but never explained why this was so. *Id.* at 443. Looking to the facts from that case sheds even less light on what distinguished the system in question as being a remote computing service. The system (and the corresponding electronic communications) in question—an e-mail service run on a computer bulletin board—was accessible by the user without the intervention of the web manager of the bulletin board: "[T]he [board] also offered customers the ability to send and receive private e-mail. Private e-mail was stored on the [board's]

computer's hard disk drive temporarily, until the addressees 'called' the [board] (using their computers and modems) and read their mail. After reading their e-mail, the recipients could choose to either store it on the [board's] computer's hard drive or delete it." *Steve Jackson Games, Inc. v. United States Secret Service,* 36 F.3d 457, 458 (5th Cir.1994). With such a factual backdrop, nothing in that court's conclusory holding even remotely suggests that it depended on a finding that a remote computing service could or could not exist absent this direct accessibility by the users and/or subscribers. Such accessibility was inherent in the computing system under review before the court in that case and hence, without further elaboration by the court, was not critical to its analysis.

This leads the Court to the statute's legislative history. During the passage of the ECPA both the Senate and the House of Representatives issued reports commenting on various aspects of the legislation, including the reference to "remote computer services." Congress noted that the purpose for the passage of the ECPA was "to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. RPT. No. 99–541, at 1 (1986). Toward that end Congress sought to harmonize the existing statutory framework with the technology and industry standards as they existed in 1987. Congress described such cutting edge technology, which from a modem-day readers perspective would seem antiquated, as follows:

> Today we have large-scale electronic mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing. A phone call can be carried by wire, by microwave or fiber optics. It can be transmitted in the form of digitalized voice, data or video. Since the divesture of AT & T and deregula-

tion, many different companies, not just common carriers, offer a wide variety of telephone and other communications services. It does not make sense that a phone call transmitted via common carrier is protected by the current federal wiretap statute, while the same phone call transmitted via a private telephone network such as those used by many major U.S. corporations today, would not be covered by the statute.

S. RPT. No. 99–541, at 3 (1986). Given Congress' understanding of the technological milieu in which it was legislating, it is not hard to understand the Ninth Circuit's observation that the ECPA has become increasingly difficult to square with more modem technological methods of communication. It is equally obvious from the quotation above that Congress had no conception of the type of communication/storage system at issue in this case when it drafted the statute.

What Congress did clearly intend, even with its 1987 understanding of the relevant communication technology, was for the statute to cover what it considered at the time to be the two relevant technologies used by businesses and individuals—those which were devoted to direct person to person communications *via* private or common carriers, and those communications involving computers. This distinction carried over in Congress' drafting of the SCA.

Under the SCA, the centrality a computer plays in facilitating the communication is key to Congress' definition of a remote computing service. The word "computer" is used exclusively in the statute when speaking of a remote computing service, be it for storage or processing, or for the related "computer facilities" required to accomplish the communications' storage. It is the one of the few means Congress used to identify and distinguish the definition of a "remote computing service" from

an "electronic communication service." Accordingly, the Court finds that, at a minimum, a computer must play a central role in facilitating the storage of the communication, as the legislative history makes clear that the incidental use of computers in providing the service in question was not envisioned by Congress as constituting a remote computing service: "Remote computing services is not intended to apply to computer services offered by the various telephone company central offices in connection with the routing of telephone calls (such as speed dialing, call forwarding, and three-way dialing)." H.R. RPT. No. 99–647, at 75 (1986).

The central role Arch Wireless' computer facilities played in accomplishing the storage of the text messages, and then recalling the same upon request by the City, is not challenged in this case, and for that reason places the service they provided closer to a remote computing service. That said, this distinction has lost much of its salience since the passage of the ECPA as computers have become increasingly more central to the operation of various forms of electronic communication. Defense counsel acknowledged at oral argument that such a means of distinguishing between the two statutory terms has become "blurred by the progression of technology" such that, in her view, no "viable" means of differentiating the two exists. Plaintiffs seize upon defense counsel's gloomy assessment as proof positive that their interpretation of the statute is necessary lest the statutory terms become meaningless.

To begin, the Court does not share defense counsel's view that the statutory terms have become obsolete as, for the reasons outlined below, at least one other distinguishing and still salient characteristic exists. Similarly, plaintiffs' efforts to breathe life into the statutory terms through a direct accessibility corollary may

have the virtue of maintaining a statutory distinction, but it carries with it the vice of having no support in the statute's text or legislative history.

The legislative history reveals that Congress understood that e-mail had a direct accessibility component, but its recognition of this fact was more a matter of describing how e-mail worked than in defining what was needed for a service to qualify as a remote computing service:

> In the case of either electronic mail or voice mail, the sender—a user of the service—has necessarily authorized the addressee's access to the message. The addressee's acquisition of the message is therefore clearly within the contemplation of section 2701(c)[, excepting from the statute's prohibitions "conduct authorized ... by a user of that service with respect to a communication of or intended for that user"]. Sometimes the addressee, having requested and received a message, chooses to leave it in storage on the service for re-access at a later time. *The Committee intends that, in leaving the message in storage,* the addressee should be considered the subscriber or user from whom the system received the communication for storage, and that such communication should continue to be covered by section 2702(a)(2)[, concerning divulgence of communications held in storage on remote computing services].

H.R. Rpt. No. 99–647, at 64–65 (1986)(emphasis added). Nothing in this passage even remotely speaks to Congress expressing a view that only directly accessible electronic communications qualified as a remote computing service. The passage simply describes matter of factly how e-mail operates, and then notes that the retrieval of messages held in long-term storage on the computer after being opened still fall within the purview of a

remote computing service. The accessibility of the e-mail was not critical to this conclusion; rather, it is the question of *storage* that is key to understanding Congress' conclusion that the e-mail service in question remained a remote computing service.

One need look to another section of the legislative history to determine that this is so. The Senate Report recognized the *possibility* that such information in computer storage could be accessible by the subscriber/user, but it also recognized that such access can be given by the service provider *after* information has been supplied to it by the subscriber or customer. S. RPT. No. 99–541, at 10–11 (1986). Must such relaying of information by the subscribers or customers be done by them accessing the subscriber's network or logging a request for the same on their computer network, or can it be phoned in (as in this case)? Congress' answer was the latter. The Senate Report noted that computer storage in off-site facilities operated by service providers provide "sophisticated and convenient computing services to subscribers and customers from remote facilities" by allowing "processing [to be] done with the customer or subscriber using the facilities of the remote computing service in essentially a time-sharing arrangement, *or it can be accomplished by the service provider on the basis of information supplied by the subscriber or customer. Data is most often transmitted between these services and their customers by means of electronic communication.*" S. RPT. No. 99–541, at 10–11 (1986)(emphasis added). Congress viewed the storage of such information on the service provider's off-site computer to be the critical factor; how that information came to exist on the service provider's computer, or how that information was later transferred from the provider's computer to the subscriber does not appear material. The Senate Report's mention that use of electronic communication to share or transmit this information was "often" the means of transmission necessarily means that it need not *always* have to be accomplished that way. The sending of written or telephonic requests for transcripts of what is contained on a service provider's computer network can similarly accomplish the processing/storage function contemplated by the statute. That Congress would sanction such a means of transmission in a remote computing service casts aside plaintiffs' push for a direct accessibility gloss to the statute.

Refusing to apply plaintiffs' statutory gloss does not mean, even with the widespread and pervasive use of computers in facilitating electronic communications in the modern day, that the statutory terms do not remain salient. There is another distinction the statute, as it has been interpreted by the courts, draws between the two terms, and one that is not that surprising given the SCA's name and purpose—the length of and the purpose for the storage.

Courts have interpreted the federal wiretap statute to exclude from its coverage the storage of electronic communications no matter how short that storage may entail. *See Konop,* 302 F.3d at 876 (providing a "narrow definition" of intercept for purposes of the federal wiretap statute such that only the "acquisition of a communication," be it wire or electronic, "contemporaneous with the transmission" of that communication falls within the scope of the wiretap statute). Thus, in *Konop* the court held that the "acquisition of email messages stored on an electronic bulletin board system, but not yet retrieved by the intended recipients, was not an interception under the wiretap act." *Id.* Rather, even such transitory storage of electronic communications lasting only a few seconds fell within the SCA's provisions:

Storage is a necessary incident to the transmission of electronic communications. Email and other electronic communications are stored at various junctures in various computers between the time the sender types the message and the recipient reads it.... It is therefore argued that if the term 'intercept' does not apply to the *en route* storage of electronic communications, the wiretap act's prohibition against 'intercepting' electronic communications would have virtually no effect. While this argument is not without appeal, the language and structure of the ECPA demonstrate that Congress considered and rejected this argument. Congress defined 'electronic storage' as any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof, 18 U.S.C. § 2510(17)(A), indicating that Congress understood that electronic storage was an inherent part of electronic communication. Nevertheless, ... Congress chose to afford stored electronic communications less protection than other forms of communication.

*Id.* at 878 n. 6. That the storage of electronic communications was confined to the provisions in the SCA was a conscious choice by Congress, as it "deliberately structured [the ECPA] to afford electronic communications *in storage* less protection than other forms of communication." *Id.* at 877 (emphasis in original). The removal of all stored communications from the coverage of the wiretap statute makes the treatment of stored communications one of the principal focus points in interpreting the SCA. *See id.* at 888 (Reinhardt, J., dissenting)(noting that the court's decision meant that "all acquisitions of the contents of electronic communications would escape the intercept prohibition [contained in the wiretap statute] entirely"). That this is so is not surprising given that the "ECPA ...

created the SCA for the express purpose of addressing 'access to *stored* ... electronic communications and transactional records.' " *Id.* at 879. It therefore should come as no surprise that differences in the length of or the purpose for storing the electronic communication in question would be used by the SCA to differentiate whether the service in question was a remote computing service or an electronic communication service.

The Ninth Circuit in *Theofel v. Farey–Jones,* 359 F.3d 1066 (9th Cir.2004), drew such a distinction in differentiating between a remote computing service and an electronic communication service. In this regard the court used one of the definitions for the term "electronic storage" in section 2510(17):

Our interpretation [of what constitutes electronic storage for purposes of the federal Wiretap Act] also does not render irrelevant the more liberal access standards governing messages stored by remote computing services. The government's premise is that a message stored by a remote computing service "solely for the purpose of providing storage or computing processing services to [the] subscriber" would also necessarily be stored for purposes of backup protection under section 2510(17)(B) [of the Federal Wiretap Act], and thus would be subject to the more stringent rules governing electronic storage [under the Federal Wiretap Act]. But not all remote computing services are also electronic communications services and, as to those that are not, section 2510(17)(B) is by its own terms inapplicable. The government notes that remote computing services and electronic communications services are 'often the same entities,' but 'often' is not good enough to make the government's point. Even as to remote computing services that are also electronic communications services, not all storage covered by sections

2702(a)(2)(B) and 2703(b)(2)(B) is also covered by section 2510(17)(B)[, setting forth more rigorous access standards for messages stored either temporarily or for purposes of backup protection under the federal Wiretap Act]. A remote computing service might be the only place a user stores his message; in that case, the messages are not stored for backup purposes.

*Id.* at 1076–77.

*Theofel's* distinction—that the placement of an electronic communication in storage for backup protection keeps the service in question from being a remote computing service—was predicated on the definition of electronic storage contained in section 2510(17)(B). Such reference provides guidance in this case as well. Subsection (17)(A) states that electronic storage includes the "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." *Theofel's* reasoning that section 2510(17) de-marks a means for excluding certain services from the coverage of a remote computing service would presumably also consider that such intermediate or incidental storage of electronic communications is similarly not considered a remote computing service. Absent the type of storage listed in section 2510(17), the only type of storage left available for a remote computing service to provide is long-term storage of communications not incidental to the transmission of the communication itself and not meant for backup protection. Arch Wireless' service would meet this definition. The storage is long-term, is not incidental to the transmission of the communication itself, and is not meant for backup protection but apparently as the single place where text messages, after they have been read, are archived for a permanent record-keeping mechanism.

Such a distinction makes a great deal of sense when considered in conjunction with other portions of the SCA. Section 2702(b)(3), for instance, exempts from the SCA's prohibition situations in which consent of the sender or receiver of an electronic communication has been given. This exception, however, only applies in the context of an electronic communication service. By confining electronic communication services to, among other things, the incidental storage of communications in the transmission of communications, the statute's exception is reasonable. Consent would be limited to the individuals who are closest in time to the storage—the *cause generis* for the statute's prohibitions. Such a common sense approach would be placed into question if an electronic communication service could be said to provide long-term storage of communications as well because there would be no need to distinguish between the senders/receivers of the message, on the one hand, and the subscribers to the service, on the other.

This leads to another point that neither side in this case acknowledges—that Congress recognized that service providers can offer a wide variety of different services, each one being characterized differently under the statute; the fact that the services are provided by one provider does not transform the characteristics of each service in question. As the Senate Report acknowledges, "different aspects of the same communication might be characterized differently" because "the transmission of data over the telephone is an electronic communication," but "if the parties use the line to speak to one another between data transmissions, those communications would be wire communications." S. Rpt. No. 99–541, at 16 (1986). By the same token, different aspects of what is provided by a service provider may be characterized differently. The service allowing, for example, a person to transmit text messages from their pager to the recipient's pager and for the recipient to read that message

may very well be the provision of an electronic communication service. The subsequent long-term storage of that message on the service provider's computer system for record-keeping purposes by the subscriber may be something entirely different, say a remote computing service. Indeed, the legislative history reveals that Congress understood such a duality as being possible given the vast array of services a provider could offer: "Existing telephone companies and electronic mail companies are providers of electronic communication services. Other services like remote computing services may also provide electronic communication services." S. Rpt. No. 99–541, at 14 (1986).

The parties in this case apparently take an "all or nothing" approach in characterizing what Arch Wireless provided to the City—either the provision of text-messaging pager/transcript retrieval service was a remote computing system or it was an electronic communications system. From the Court's reading of the legislative history, Congress took a middle course that was predicated both on whether the use of a computer was central to the service in question as well as the length of and purpose for storage of the electronic communication in question. Certain aspects of Arch Wireless' service—the provision of text messaging (perhaps including the 72–hour short-term storage of such messages *before* they are opened and read by the recipient)—were the provision of purely electronic communications system, while others—the retrieval of the contents of those text messages kept in *long*-term storage on its computer network *after* they had been received—were that of a remote computing service. Given that it is the latter service that is at issue in this case, the Court finds that section 2702(b)(3)'s subscriber exception applies.

■ This finding has wider implications for plaintiffs' state law invasion of privacy and state constitutional claims against Arch Wireless. Those claims are predicated entirely upon Arch Wireless' role in turning over the transcripts of Jeff Quon's pager to the governmental defendants. Arch Wireless asserts that, in light of the Court's above finding, such a claim is preempted by the SCA. In essence, Arch Wireless contends that it cannot be held liable for something (turning over the pager transcripts per the request of the pager's subscriber, the City) that is specifically condoned by the SCA. This argument has great appeal.

■ As the Ninth Circuit described the preemption doctrine:

> Congress may preempt state law in several different ways. Congress may do so expressly (express preemption). Even in the absence of express preemptive text, Congress' intent to preempt an entire field of state law may be inferred "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" (field preemption). State law also is preempted "when compliance with both state and federal law is impossible," or if the operation of state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " (conflict preemption).

*In re Cybernetic Servs., Inc.,* 252 F.3d 1039, 1045–46 (9th Cir.2001).

■■ Here, the type of preemption in question is one of express preemption. "Express preemption occurs when Congress enacts a statute that expressly commands that state law on the particular subject is displaced." *Gadda v. Ashcroft,* 377 F.3d 934, 944 (9th Cir.2004). "The purpose of Congress is the ultimate touchstone in any preemption analysis, so we look first and foremost to Congress' ex-

press statement of its intent," and even then in deducing what Congress meant to preempt "often resembles an exercise in implied preemption analysis." *Metrophones Telecommunications, Inc. v. Global Crossing Telecommunications, Inc.*, 423 F.3d 1056, 1071–72 (9th Cir.2005).

Section 2708 in the SCA provides that, other than pursuit of federal constitutional violations, the remedies outlined in the SCA are the exclusive ones a party may pursue in court for conduct covered by the statute: "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." Congress' command in enacting section 2708 is clear: Only those remedies outlined in the SCA are the ones, save for constitutional violations, that a party may seek for conduct prohibited by the SCA. The SCA thus displaces state law claims for conduct that is touched upon by the statute, such as in divulging stored electronic communications to third parties. One federal district court, in an unpublished decision, has cited to section 2708 to hold that the statute completely preempts state law claims arising from *conduct* covered by the SCA. *See Muskovich v. Crowell*, 1995 WL 905403, at *1 (S.D.Iowa March 21, 2005)("In section 2708, Congress unequivocally expressed an intent to 'occupy the field' and provide the exclusive remedies for conduct regulated by ECPA"). On that point the Court agrees with *Muskovich* that, in enacting the SCA, Congress left no room for supplementary state regulation for conduct covered by the statute. There are other indicia in the statute itself that evinces Congress' effort to make suits to enforce or seek redress for the statute's prohibitions the exclusive ones for parties to pursue. The intricacies of the regulatory

scheme crafted by the ECPA (and the SCA) are fairly comprehensive: Regulating private parties conduct, law enforcement efforts to uncover stored electronic communications, and devising a fairly complicated scheme to accomplish both, including a private right of action for violations of the statute's provisions. In light of the breadth of the SCA regulatory scheme and the clear command concerning the exclusivity of remedies (aside from federal constitutional claims) contained in section 2708 for conduct covered by the statute, it stands to reason "that Congress 'left no room' for supplementary state regulation." *Cybernetic*, 252 F.3d at 1045.

Rather than responding to Arch Wireless' argument, plaintiffs argue that the SCA limits its preemptive scope to those matters outlined in section 2707(e) of the statute. Their argument is off mark. Section 2707(e) provides a good faith defense to *liability* under the SCA, but in no way seeks to limit or confine the preemptive impact the SCA would have on related state law claims. Here, the Court has already found that Arch Wireless is not liable under the statute. The intricacies of whether Arch Wireless is also entitled to a good faith defense to liability is therefore not only a moot point—they are not liable under the statute to begin with—but again says nothing to dampen section 2708's preemptive effect with respect to plaintiffs' state law claims against Arch Wireless.

Accordingly, the Court **GRANTS** summary judgment to all the defendants on plaintiffs' SCA claim and to Arch Wireless on plaintiffs' state invasion of privacy and state constitutional claims.

### B. *Fourth Amendment* [4]

Aside from the statutory concerns raised by the auditing of Jeff Quon's pager lies a

---

4. Given that the arguments lodged by the governmental defendants against plaintiffs' invasion of privacy claim and state constitutional claim are the same as those pressed against plaintiffs' Fourth Amendment claim,

constitutional question—Was the seizure of these text messages unreasonable per the Fourth Amendment?

■ The Fourth Amendment, as applied to the States and municipalities through the Fourteenth Amendment, *see South Dakota v. Opperman,* 428 U.S. 364, 365, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." A person has Fourth Amendment rights only in those areas and items where he or she has "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). The reasonableness of a government employee's expectation of privacy in his or her workplace was addressed by the Supreme Court in *Ortega.* There the court began with the proposition that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *Id.* at 717, 107 S.Ct. 1492. That said, some expectations of privacy held by public employees may be unreasonable due to the "operational realities of the workplace." *Id.* For instance, "[p]ublic employees' expectations of privacy ... may be reduced by virtue of actual office practices and procedures, or be legitimate regulation." *Id.* In any event, "[g]iven the great variety of work environments in the public sector, the question whether an em-ployee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Id.* at 718, 107 S.Ct. 1492.

■ Even if a public employee has a reasonable expectation of privacy in the area or item searched by his or her governmental employer, the inquiry does not end there. The Court must still assess the *reasonableness* of the search conducted by the governmental employer: "[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id.* at 725–26, 107 S.Ct. 1492. Evaluation of the reasonableness of such an intrusion is gauged by looking to "the inception and the scope of the intrusion." *Id.* at 726, 107 S.Ct. 1492. "A search of an employee's office by a supervisor will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." *Id.* A search is considered reasonable in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *Id.*

see Defs' Mot. Summ. J. at 33–38, the Court will confine its discussion to the Fourth Amendment. *See Sacramento County Deputy Sheriffs Ass'n. v. County of Sacramento,* 51 Cal.App.4th 1468, 1487, 59 Cal.Rptr.2d 834 (1996)("Here, we conclude there was no 'offensive' conduct supporting tort liability [for invasion of privacy], for the same reasons there is no constitutional deprivation"). Defendants' argument that the audit was not a serious invasion of plaintiffs' privacy is nothing more than a repackaging of their argu-ment that plaintiffs could have no reasonable expectation of privacy in such communications. (Defs' Mot. Summ. J. at 39 (claiming no serious invasion of privacy as "equipment owned by employer," such monitoring is "very typical in today's workplace" and "it was authorized by the City policies" to which plaintiffs "were aware and had consented to")). As such it too would fail if the Court would hold, as it does, that plaintiffs did have a reasonable expectation of privacy in those communications.

1. *Auditing Quon's Pager*

The parties debate whether Jeff Quon (and the remaining plaintiffs by extension) had a reasonable expectation of privacy in the text messages sent to and from his pager.[5] Both sides acknowledge that the pager was owned by the City, not Quon; they acknowledge that both written and verbal directives had been issued to Quon, through which the police department reserved the right to audit the contents of the text messages sent and received by the pager; and that Lieutenant Duke had implemented an unwritten policy of foregoing auditing an employee's city-issued pager so long as he or she agreed to pay the overage charges incurred for utilizing the pager for personal use. In light of this agreed-upon factual milieu, it is for the Court then to determine the purely legal questions of (1) whether Quon had a reasonable expectation that any personal messages he sent or received over the pager would remain private; (2) the reasonableness of the audit; and (3) whether Chief Scharf is entitled to qualified immunity

(a) *Reasonable Expectation of Privacy*

[redacted] A public employee's expectation of privacy is judged against the "operational realities of the workplace" in which the employee works.[6] *Ortega,* 480 U.S. at 715, 107 S.Ct. 1492. The Court would agree with defendants' position that Quon would have no such reasonable expectation of privacy if all that was before it was the fact that Quon had been informed in writing and in person that the City considered the use of the pagers to fall within its e-mail policy, and that the City would monitor the use of its pagers, including auditing what messages were sent and received by them at any time. All of this would have put any employee on fair notice that the communications that were transmitted over the pager were, in essence, open to the public for view. *See Ortega,* 480 U.S. at 719, 107 S.Ct. 1492 (noting that expectation of privacy not reasonable where employer has a "regulation or policy discouraging employees ... from storing personal papers and effects in their desk or file cabinets"); *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1334, 1335 (9th Cir.1987)(agreeing that "public employees' expectations of privacy may be reduced by virtue of actual office practices and procedures" such as "notice from his employer that searches of the type to which he was subjected might occur from time to time for work-related purposes").

Thus, for instance, in *Bohach v. City of Reno,* 932 F.Supp. 1232, 1234–35 (D.Nev. 1996), the district court held that a department memorandum informing employees that messages sent on city-issued pagers would be logged on the department's network and that certain types of messages were banned in conjunction with the fact that such recording of messages is "part of the 'ordinary course of business' for police departments" diminished any expectation

5. Before addressing the merits of the parties' arguments, it appears that one of the remaining plaintiffs, Doreen Klein, has no stake in this claim. She did not send or receive text-messages from Quon; therefore, the auditing of Quon's pager in no way invaded her privacy or amounted to a search or seizure in violation of her Fourth Amendment rights. Defendants have moved to have Klein dismissed as a plaintiff in this matter, and plaintiffs have not filed anything contesting that result. Therefore, insofar as Klein is seeking to press a Fourth Amendment claim against the governmental defendants for auditing of Quon's pager, the governmental defendants are awarded summary judgment.

6. Neither party disputes that Quon (and by extension the other plaintiffs) had a subjective expectation of privacy in the text-messages sent or received on the pagers. Accordingly, the Court shall confine its analysis to whether that expectation of privacy was objectively reasonable.

of privacy the employee had in what he sent or received on his pager. Similarly, in *United States v. Ziegler,*, 456 F.3d 1138 (9th Cir.2006), the Ninth Circuit held that a company's ownership of the employee's workplace computer, the regular monitoring of the use of the employees' workplace computers, the issuance of a company policy announcing that such monitoring would take place, and the dissemination to its employees of a prohibition from using the computer for private use defeated any objective expectation of privacy those employees may have had in their workplace computers. *Id.* at 1146.

This "operational reality," however, was fundamentally transformed by Lieutenant Duke's conscious decision not to enforce this policy. Apparently not wanting to devote resources to reviewing the contents of text messages sent or received from pagers that exceeded the monthly character limit, Lieutenant Duke made it clear to the staff, and to Quon in particular, that he would *not* audit their pagers so long as they agreed to pay for any overages. Given that Lieutenant Duke was the one in charge of administering the use of the city-owned pagers, his statements carry a great deal of weight. Indeed, before the events that transpired in this case the department did not audit any employee's use of the pager for the eight months the pagers had been in use. This was true even when overages were involved. Lieutenant Duke in effect turned a blind eye to whatever purpose an employee used the pager, thereby vitiating the department's policy of any force or substance. By doing so, Lieutenant Duke effectively provided employees a reasonable basis to expect privacy in the contents of the text messages they received or sent over their pagers; the only qualifier to guaranteeing that the messages remain private was that they pay for any overages. *See United States v. Slanina,* 283 F.3d 670, 677 (5th Cir.2002)("given the absence of a city poli-

cy placing Slanina on notice that his computer usage would be monitored and the lack of any indication that other employees had routine access to his computer, we hold that Slanina's expectation of privacy was reasonable"); *Leventhal v. Knapek,* 266 F.3d 64, 74 (2nd Cir.2001)(holding employee had reasonable expectation of privacy in "storing personal items in his office computer" where, despite employer's policy prohibiting use of state equipment "for personal business," employer acknowledged that "employee would not violate state policies by keeping a personal checkbook in an office drawer, even though it would take up space there"); *Adams v. City of Battle Creek,* 250 F.3d 980, 984 (6th Cir.2001)(noting no diminished expectation of privacy where "defendants ... did not routinely monitor officer's pagers or give notice to officers that random monitoring of their department-issued pagers was possible" and "where the policy" against "personal use" of such pagers "had not been enforced"); *Cf. Ziegler,* 456 F.3d 1138, 1144 n. 10 (recognizing that situation would be fundamentally different where "employer failed to implement a policy limiting personal use of or the scope of privacy in the computers, or had no general practice of routinely conducting searches of the computers").

■■■ That the pager in question was owned by the City adds nothing by itself to the analysis. A *per se* rule that public employees cannot have a reasonable expectation of privacy when using property owned by their employer would be at odds with the Supreme Court's holding in *Ortega.* There the Supreme Court held unanimously that the employee could have a reasonable expectation of privacy in the personal items he stored in a desk that was presumably owned by his employer. *Id.* at 719, 107 S.Ct. 1492. Expectations of privacy are not tied up by reference to

property law. *See Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Schowengerdt,* 823 F.2d at 1333 ("Fourth Amendment privacy interests do not, however, turn on property interests .... the [United States Supreme] Court rejected the contention that those who seek to invoke Fourth Amendment protections must have a property right in the area searched"). As the Ninth Circuit recently explained in *Ziegler:* "We do not hold that company ownership of the computer is alone sufficient to defeat an expectation of privacy.... As always, the issue depends on what expectations may reasonably coexist with that ownership." 456 F.3d 1138, 1146 n. 11. Here, any lessened expectation of privacy in one's pager messages due to it belonging to the City was canceled out by what the City, through Lieutenant Duke, communicated to its officers on how they could use that equipment.

Similarly, defendants' plea that the use of such equipment in the workplace is entitled to a lesser expectation of privacy given "community" or "social norms"—specifically, that "with the proliferation of" various electronic communication systems "in the work place, it is extremely common for employers to monitor employee usage of these devices and systems"—loses its salience in light of the particular circumstances of this case. (Gov't Defs' Mot. Summ. J. at 36). Appeals to broad societal norms quickly give way once an employer, like the defendants in this case, promulgates and announces a policy to its employees detailing how much privacy to expect in using specified equipment. At that point such general norms are trumped by the *particular* norm that was implemented in the work place in question. *See Ziegler,* 456 F.3d 1138, 1145 ("we take societal expectations as they are, not as they could or (some think) should be") (citing *United States v. Silva,* 247 F.3d 1051, 1055 (9th Cir.2001)). The Court finds that it is unreasonable to expect that an employee would assume that some other *unstated* norm should inform their opinion on how much privacy to expect in using an employer's equipment once that employer expressly informs his or her employees of an *actual policy* regarding the use of that very equipment. Here, Lieutenant Duke's actions eroded any attempt on defendants' part to lessen the expectation of privacy its employees had in the use of the pagers issued to them; indeed, his actions could be said to have *encouraged* employees to use the pagers for personal matters. *See Ortega,* 480 U.S. at 719, 107 S.Ct. 1492 (holding employee had a reasonable expectation of privacy where there was "no evidence that the Hospital had established any reasonable regulation or policy discouraging employees ...·from storing personal papers and effects in their desks or file cabinets").

Governmental defendants finally argue that Quon's expectation of privacy was unreasonable given that any message sent to or from his pager was potentially subject to public disclosure under the California Public Records Act ("CPRA"). (Gov't Defs' Reply at 6). The CPRA mandates that "public records are open to inspection at all times ... and every person has a right to inspect [the same], except as hereafter provided." CAL. GOV'T CODE § 6253(a). Public records are defined as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." CAL. GOV'T CODE § 6252(d). The problem with defendants' argument is its sheer breadth. Anything and everything that *could* be subject to disclosure under the CPRA would necessarily defeat any expectation of privacy an individual employee may have in the same. The evidence is not commensurate with the breadth of defendants' argument.

There is no evidence before the Court suggesting that CPRA requests to the department are so widespread or frequent as to constitute "an atmosphere 'so open to fellow employees or the public that no expectation of privacy is reasonable.'" *Leventhal,* 266 F.3d at 74 (quoting *Ortega,* 480 U.S. at 718, 107 S.Ct. 1492). Indeed, defendants' argument is quite the opposite: That the mere *possibility* someone in the public *may* make such a request is sufficient to defeat any expectation of privacy in the officers' communications on the pagers. This type of conjectured, hypothecated search of the pager transmissions by the general public does not destroy any underlying expectation of privacy an employee in Quon's position could otherwise possess in the messages sent from or received by an office pager. As was made clear in *Ortega,* "constitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer." 480 U.S. at 717–18, 107 S.Ct. 1492 (emphasis in original).

Moreover, the Court is not convinced that, even assuming such public records requests were frequent occurrences, the facts in this case would not, given the particulars of Lieutenant Duke's unstated policy, still entitle the officers from having an objectively reasonable expectation of privacy in their pager transmissions. Again, even under Fourth Amendment analysis in the public employment context, "[t]he employee's expectation of privacy must be assessed in the context of the employment relation." *Ortega,* 480 U.S. at 717, 107 S.Ct. 1492. That someone in the public at large *could* make a CPRA request to look at the item in question does not mean that the individual employee cannot have a reasonable expectation of privacy that his employer will not do the same. As noted above, such Fourth Amendment balancing is determined on a "case-by-case

basis" with reference to the regulations, policies, and practices put in place by their employer at the particular work setting. *Ortega,* 480 U.S. at 717–18, 107 S.Ct. 1492.

Thus, in *Zaffuto v. City of Hammond,* 308 F.3d 485, 489 (5th Cir.2002), the Fifth Circuit rejected the argument that, simply because the contents of telephone recordings made at work were subject to disclosure under Louisiana's public records law, the police officers had no reasonable expectation of privacy in out-going telephone calls made from the police department's communications room. The court found that the officer's belief that the department's policy was that only *incoming* calls would be recorded could lead an officer to have a reasonable expectation that *outgoing* calls would remain private, even if those calls were in fact recorded by the department and hence subject to disclosure under the state's public records law. *Id.* Here, the officers were told that, so long as they paid overages, no audits would be performed. An officer confronted with such a policy could, like the police officers in *Zaffuto,* reasonably expect that so long as they paid the overages the department would not audit, and hence, would not retain any files (defeating the possibility of disclosure under the CPRA) regarding what was sent to or received by their pager. Given such an understanding of the particular work-setting, coupled with the lack of any evidence that such CPRA requests were frequent or widespread, the Court finds that potential disclosure of the transcripts of the text messages to the public under the CPRA does not detract from the reasonableness of Quon's privacy expectation concerning the same.

**(b)** *Reasonableness of the Audit*

 Having found that Quon had a reasonable expectation of privacy in the

messages sent and received by the city-issued pager, the Court must next determine whether the auditing of that pager was "reasonable under the circumstances." *Schowengerdt*, 823 F.2d at 1335. In addressing this question (as well as the final question, concerning qualified immunity) the Court is confronted with a factual dispute which, for the reasons outlined below, is a material one. This factual dispute prevents the awarding of summary judgment to either side in this case, requiring instead that this matter be submitted to a jury. The dispute in question concerns the actual *purpose* or *objective* Chief Scharf sought to achieve in having Lieutenant Duke perform the audit of Quon's pager. Chief Scharf stated in his deposition testimony that the goal of the audit was to see whether officers were using their pagers to "play games" while on duty, something which he termed as misconduct because it took the officer's attention away from their work. Lieutenant Duke's deposition testimony, however, alludes to another reason for the audit—to determine whether there was a need to "increase the amount of [monthly] characters" allotted for work-related usage.

 Insofar as the audit was meant to ferret out misconduct by determining whether the officers in question were "playing games" with their pagers or otherwise "wasting a lot of City time conversing with someone about non-related work issues," the Court finds the audit was *not* justified at its inception. Key to the Court's finding on this point is the fact that the officers' pagers were audited for the period when Lieutenant Duke's informal, but express policy of *not* auditing pagers unless overages went unpaid was in effect. As discussed above, that policy essentially informed department personnel equipped with city-issued pagers that, so long as they paid for the overages, the department was *not* going to audit their pagers to determine whether the overage

was on account of them using the pager for personal matters, whatever that might be. It was only when the officer in question *contested* the overage by asserting that its excess use was for business reasons that an audit would be performed. Given this policy, it cannot be said that determining whether the officers went over the character limits during this period because they used the pagers for personal matters (or, in Chief Scharf's parlance, "wasting time playing games" while on duty) was "misconduct"; it was the very conduct Lieutenant Duke's informal policy allowed, condoned, and even encouraged. For a search to be considered justified at the inception when it is meant to discover workplace misconduct, there must exist "reasonable grounds" to suspect that such evidence of misconduct would be uncovered by the search in question. In light of Lieutenant Duke's policy, the search would not have revealed misconduct; rather, it would have uncovered conduct permitted by Lieutenant Duke to occur.

The result would, of course, be different if Chief Scharf had asked for an audit of pagers for a period of time *after* Lieutenant Duke's policy ended and the termination of that policy had been communicated to the officers. At that point, the use of the pagers to "play games" while on duty may well have been considered misconduct under the policy then in effect. Here, the audit as implemented could not in any way turn up evidence of such misconduct as the period being audited expressly allowed, per Lieutenant Duke, for the officers to use the pagers in the manner now objected to by Chief Scharf.

 This leaves the other possible purpose advanced for the audit (and one pressed as such by the defendants)—determining the utility or efficacy of the existing monthly character limits. Under this rationale, the audit was done for the

benefit of (not as a punishment against) the officers who had gone over the monthly character limits. Under Lieutenant Duke's policy and practice, it was understood that, unless contested by the officer, all of the overage was considered as personal use, a fact confirmed by the officer's subsequent payment for the same. The department, however, was allegedly concerned that some of the overages—but perhaps not a large enough percentage to warrant an officer to seek an audit by contesting the overage charges—may have been attributable to work-related use of the pager. That is, the purported concern was not that the officers were engaged in misconduct, but that the officers were paying too much in overages because the character limits were, on the one hand, not high enough to capture all the work-related usage of the pagers, but, on the other hand, not low enough to encourage them to contest the same. To make sure that some of the overages for which the officers were paying was not work-related, the audit was performed to see, in fact, how many characters were being used for business reasons. If more than the monthly character limits were so used, the department would increase the character limits so that the officers would not have to pay for any of their work-related duties out of their own pocket.

The governmental defendants argue that the search, with such an underlying rationale as just described, was justified at its inception because Jeff Quon "had gone over the allotted number of characters," and the "City needed to determine why only he and one other officer had done so." (Defs' Mot. J. Pleadings at 7). Defendants next argue that the scope of the search was reasonable because it was directed precisely at the reason for the search itself: "The purpose of the search was simply to determine whether or not the character limit was to be increased, as had been previously done. In order to make

such a determination, the messages had to be reviewed to determine what percent were business versus personal." (Defs' Mot. J. Pleadings at 8). While the Court may not find this convincing in light of much of the deposition testimony it has reviewed, the Court does find that, *if* a jury were to find that this was in fact the purpose for the audit, the audit would both be justified at its inception and would be reasonable in its scope.

In order for the department to determine whether there existed hidden work-related costs borne by its officers that were brought about by the number of monthly characters allowed for the pagers (in the sense that the percentage was not large enough to incentivize the officer in question to contest the overage charge), it would be necessary to actually look at the transcripts of the text-messages themselves. Only by looking at the actual number and type of characters used for a given period could the department determine whether there existed such hidden costs. In performing this audit, the department limited its audit to just those officers that had exceeded the monthly character limits for the time in question, which would be understandable if the reason for the audit was to make sure officers who have exceeded the character limits were not paying hidden work-related costs in those overage charges. *See Schowengerdt*, 823 F.2d at 1336 ("the scope of the inquiry must be no broader than necessary . . .[,] if the depth of the inquiry or extent of the seizure exceeded that necessary for the government's legitimate purposes, . . . the search would be unreasonable").

The plaintiffs question the reasonableness of the scope of the audit under this theory, suggesting that the department could have achieved its goal by asking the officers themselves whether some of the overages were for work-related reasons, or

by looking only at the telephone numbers dialed by (as opposed to the text messages themselves sent by) the officers. "[I]f less intrusive methods were feasible," that would play into the reasonableness of the audit's scope. *Schowengerdt,* 823 F.2d at 1336. Neither proposition advanced by plaintiffs, however, adequately serves this rationale for the audit. Even if talking to the officers beforehand may have brought to light information that some of the overages in question were for work-related reasons, only by performing an audit of the text messages themselves could the department confirm that the officers' recollection was accurate (which may be less than reliable given the passage of time since the messages were typed or read on the pager by the officer). Looking at the telephone numbers dialed by the officers is equally problematic. Although the telephone numbers may be a means of determining whether the person who was paged was a co-worker, that fact alone does not provide any definitive answer as to *what* those individuals were text-messaging each other about. As demonstrated by the actual audit that was performed in this case, text-messaging a fellow employee could be done largely for personal, not work-related, reasons. Thus, the only way to accurately and definitively determine whether such hidden costs were being imposed by the monthly character limits that were in place was by looking at the actual text-messages used by the officers who exceeded the character limits.

Accordingly, the Court finds that if the purpose for the audit was to determine if Quon was using his pager to "play games" and "waste time," then the audit was not constitutionally reasonable, and performing the same violated the Fourth Amendment rights of Quon and those to whom he communicated. On the other hand, if the purpose for the audit was to determine the efficacy of the existing character limits to ensure that officers were not paying hidden work-related costs, then the Court finds that no constitutional violation occurred. A jury shall decide, based on the evidence, which was the primary purpose of the audit.

### (c) *Qualified Immunity*

■ Having found a constitutional violation under one (but not the other) of the potential rationales for the audit, the Court must determine whether Chief Scharf is entitled to immunity from suit as to that violation based on his argument that the uncertainty in the law at the time he ordered the audit was such that a reasonable officer would not have known that his act violated the Fourth Amendment.

■ "[G]overnment officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Such "immunity from suit" flows from the acknowledgment "that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). To decide whether a police officer is entitled to qualified immunity, a court must first determine whether the facts "[t]aken in the light most favorable to the party asserting the injury[, *i.e.,* the plaintiff,] . . . show [that] the officer's conduct violated a constitutional right . . . ." *Id.* at 201, 121 S.Ct. 2151. If so, the next step is to ask whether "the right [that was violated] was clearly established . . . in light of the specific context of the case." *Id.* In other words, "would [it] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

■ For the reasons stated above, Chief Scharf's ordering of the audit, under the guise of seeking to ferret out misconduct (that is, "playing games" and "wasting time"), violated plaintiffs' constitutional rights.[7] This leaves the question of whether violation of that right was clearly established at the time Chief Scharf ordered the audit of Quon's pager. *Saucier* provides that, "[f]or a right to be clearly established, it must be defined with sufficient specificity that a reasonable officer would have known he was violating it." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003), *overruled on other grounds*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). As one court remarked, officials will not stand trial "for 'bad guesses in gray areas' but only for 'transgressing bright lines.'" *Doe v. Broderick*, 225 F.3d 440, 453 (4th Cir.2000). If Chief Scharf made a reasonable mistake about what the law requires, he is immune from suit. *Id.* ("qualified immunity exists to protect those officers who reasonably believe that their actions do not violate federal law").

Here, Chief Scharf argues that he made such a reasonable mistake as certain facts could lead a reasonable official to conclude that Quon did not have a reasonable expectation of privacy in the communications made over the pager: (1) Quon was aware of the department's written policy that pager communications could be audited; (2) the messages sent or received on the pagers were subject to disclosure under the CPRA; and (3) the district court's decision in *Bohach* had upheld the auditing of pagers under circumstances similar to those in this case. (Gov't Defs' Mot. J. Pleadings at 13–14). None of these facts withstand scrutiny as, individually or collectively, they fail to acknowledge the one

additional, undisputed fact that Chief Scharf was also aware of at the time he ordered the audit: Lieutenant Duke's informal policy of allowing officers to use the pagers for personal matters so long as they paid for any overages; audits would only be done if the officer contested payment of overages on grounds that the overage was work-related.

Even before the Supreme Court's decision in *Ortega*, it was well-established that a public employee "would enjoy a reasonable expectation of privacy in areas given over to his exclusive use, unless he was on notice from his employer that searches of the type to which he was subjected might occur from time to time for work-related purposes." *Schowengerdt*, 823 F.2d at 1335; *see also Ortega v. O'Connor*, 146 F.3d 1149, 1157 (9th Cir.1998)(holding that even as far back as 1981 it was clearly established that, "in the absence of an accepted practice or regulation to the contrary, government employees ... had a reasonable expectation of privacy in their private offices, desks, and file cabinets"). That is to say, a reasonable official would have understood that a public employee's expectation of privacy was defined by "the existence and scope of policies and practices or regulations relating to searches at" the work site. *Schowengerdt*, 823 F.2d at 1335.

All of the circumstances advanced by Chief Scharf do not make any room for this one critical piece of evidence necessary in evaluating Fourth Amendment questions in the public employment context—namely, the operative policy in effect for the period the audit was ordered to be performed. In *Bohach*, for instance, the policy in place at the time of the audit

---

7. For purposes of qualified immunity at this stage, the Court must construe the facts in favor of plaintiff and thus will assume for purposes of this section that discovery of

"misconduct" was the Chief's purpose for the audit. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

expressly prohibited the use of pagers for personal matters, something which is not true in this case. The department's written policy mentioned by Chief Scharf was countermanded (and Chief Scharf was aware of this countermand at the time he ordered the audit) by Lieutenant Duke's informal practice in managing and overseeing the use of the pagers. Under the policy here, personal use of pagers for private matters was expressly permitted provided any overage was paid. This places the case in a fundamentally different legal setting where, before the events in this case took place, an employee's expectation of privacy has been held by courts to be objectively reasonable if the employer has no policy limiting personal use of workplace equipment or fails to enforce a policy regarding the same. *See Slanina,* 283 F.3d at 676–77; *Leventhal,* 266 F.3d at 74; *Adams,* 250 F.3d at 984.

As far as the CPRA argument, as the Court has previously observed, defendants' position simply posits the *possibility* that such a request could be made which, they argue, would therefore negate an employee's expectation of privacy; however, the argument lacks any accompanying showing that Chief Scharf was aware of a *single* such instance, let alone that such requests were frequent or widespread. As such, the argument transgresses the Supreme Court's statement in *Ortega,* made long before the facts of this case, that an employer's *right* to intrude on an employee's work site does not, on its own, take away any expectation of privacy that an employee may have to the same. 480 U.S. at 717–18, 107 S.Ct. 1492. Indeed, defendants' line of analysis would trade away the key inquiry in the public employment setting by focusing on how the employer's workplace *could* operate instead of how it *actually* operates. *See Ortega,* 480 U.S. at 717, 107 S.Ct. 1492 (noting that a "public employees' expectations of privacy" are tied to "actual office practices and proce-

dures"); *Ziegler,* 456 F.3d 1138, 1145 ("we take societal expectations as they are, not as they could or (some think) should be").

As Chief Scharf knew, the policy Lieutenant Duke had put in place clearly gave officers reason to believe that what they sent or received over their city-issued pagers would not be audited unless they precipitated such an audit by contesting the overages. In short, the facts in this case did not present Chief Scharf with a "gray area, where the law is unsettled or murky," *Broderick,* 225 F.3d at 453, but one, given the policy in effect at the time, that clearly indicated that what he was doing invaded the plaintiffs' reasonable expectations of privacy.

Accordingly, the Court finds that Chief Scharf is not entitled to qualified immunity.

### 2. *Seizure of Klein and Florio's Personal Pagers and Cell Phones*

■■■■ This then leaves the question of whether seizure of Klein and Florio's cell phones and pagers violated the Fourth Amendment. In this regard, defendants apparently concede that Klein and Florio had a reasonable expectation of privacy in their personal cell phones and pagers, *see Schowengerdt,* 823 F.2d at 1335 (noting that employees have a reasonable expectation of privacy over items "given over to [their] exclusive use"), and instead shift to arguing whether the seizure of cell phones and pagers during the interview by internal affairs personnel was reasonable under the circumstances.

Defendants assert that the seizure of the cell phones and pagers was reasonable as it was necessary to prevent Klein and Florio from obstructing the investigation by using these devices to communicate to one another during the interview to coordinate and harmonize their testimony. Plaintiffs challenge the reasonableness of the sei-

zure's scope, noting that even if this was the purpose behind the seizure other measures short of taking their cell phones and pagers could, and were, in fact, employed by defendants to curb such compromise of the investigative process. It is noted that the defendants kept the two women separated from one another during the interview and that each was kept under watch by internal affairs personnel through a one-way window. Certainly, "if less intrusive methods were feasible," that would play into the reasonableness of the seizures scope. *Schowengerdt*, 823 F.2d at 1336.

The alternatives suggested by plaintiffs, however, do not adequately address the concerns prompting the seizure—thwarting the plaintiffs' ability to manufacture their testimony by communicating with one another during the interrogation process. True, separating the two from one another would keep them from being able to directly communicate with one another to manufacture their testimony, but such physical segregation does nothing to impede the plaintiffs' ability to communicate with one another using their pagers and cell phones. Similarly, having the plaintiffs under surveillance by internal affairs personnel *via* the one-way mirror in an interrogation observation room may assist in detecting such surreptitious electronic communication as it happens but it would do nothing to actually stop the communication before it occurs. The Court therefore finds that the seizure of Klein and Florio's pager and cell phone during their interrogation by internal affairs personnel was reasonable under the circumstances.

Accordingly, the Court **GRANTS** defendants summary judgment insofar as plaintiffs Florio and Klein's Fourth Amendment claim for the seizure of their cell phones and pagers, and **GRANTS** defendants summary judgment insofar as Klein seeks to assert a Fourth Amendment claim (and

related state law claim) for the audit of Quon's pager, but **DENIES** defendants summary judgment as to the remaining plaintiffs' Fourth Amendment claim and related state claims concerning the seizure of the contents of the text messages sent and received on Jeff Quon's city-owned pager.

## C. GOVERNMENTAL IMMUNITY TO STATE LAW CLAIMS

▄▄▄▄▄ Governmental defendants also argue that plaintiffs' related state law claims are barred by governmental immunity. California Government Code section 821.6 provides, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." The policy behind section 821.6 is to encourage "fearless performance of official duties .... State officers and employees are encouraged to investigate and prosecute matters within their purview without fear of reprisal from the person or entity harmed thereby. Protection is provided even when official action is taken maliciously and without probable cause." *Shoemaker v. Myers*, 2 Cal.App.4th 1407, 1424, 4 Cal. Rptr.2d 203 (1992). Furthermore, section 821.6 is not limited to conduct occurring during formal proceedings: "[I]t also extends to actions taken in preparation for formal proceedings. Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.'" *Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205, 1209–1210, 34 Cal.Rptr.2d 319 (1994). It is this last point that the parties debate in their papers. The plaintiffs argue that the auditing of Quon's pager could not have been a prelude to the institution of administrative proceedings against him as there was no proceeding to institute against him as a

result of the audit—his use of the city-issued pager for personal matters was conduct that was permissible under the policy then in effect. (Pls' Mot. Judg. Pleadings at 11). The governmental defendants respond that Chief Scharf was "investigating why officers were going over the character limits" and then term this investigation a "legitimate proceeding" as it would "ensure officers do not abuse equipment assigned to them." (Gov't Defs' Opp. to J. Pleadings at 15–16). The logic of defendants' argument (its circularity notwithstanding) in no way addresses the point raised by plaintiffs: The "in preparation" language noted in the case law refers to those investigations that give rise to or are somehow tethered to something that could have been investigated by the official in question in the first place. Simply labeling something an "investigation" does not make it so. A nexus must exist between the thing being investigated and the possibility of a proceeding being instituted. To hold otherwise would allow public officials to escape liability for any act they took so long as they were able to state that the act was part of an investigation. Here, Chief Scharf's "investigation" was for something that could never lead to the institution of formal proceedings: Either it was meant to determine whether to raise character limits, which is obviously not an administrative or judicial proceeding, or it concerned conduct that Chief Scharf knew in advance was sanctioned by his department (through Lieutenant Duke) for the period in question. As such the Court finds that governmental immunity under section 821.6 is not applicable for the actions under review in this case.

### D. *Defamation*

■ Jerilyn Quon asserts that the reason why she did not receive the job with the Upland police department is because Chief Scharf contacted the Upland police chief and disparaged her by commenting that she had sued him for divulging the contents of her then husband's pager. The defamation claim may be easily dispatched. For a defamation claim to be made there must be "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damages." *Smith v. Maldonado*, 72 Cal. App.4th 637, 645, 85 Cal.Rptr.2d 397 (1999). None of the elements for such a claim exist in this case. Jerilyn Quon, to this day, despite having gone through extended discovery, has been unable to describe except in the most general of terms the nature of this defamatory comment. All she can proffer is conjecture that a statement must have been made and that this surmised statement must have something to do with her suing Chief Scharf. *See Melaleuca, Inc. v. Clark*, 66 Cal. App.4th 1344, 1350, 78 Cal.Rptr.2d 627 (1998)("the law of defamation and the law of injurious falsehood require that a plaintiff prove far more than the publication of a false statement"); *Seelig v. Infinity Broadcasting Corp.*, 97 Cal.App.4th 798, 809, 119 Cal.Rptr.2d 108 (2002) ("plaintiff must present evidence of a statement of fact that is provably false"). The most glaring problem with this "evidence" (leaving aside whether such a statement is even untrue) is that the present lawsuit was not even filed until February 25, 2003, more than two weeks *after* the alleged statement was made. Chief Scharf's statement that Jerilyn Quon was suing him simply could not have taken place as he had not even been sued at the time the statement was allegedly made.

■ Even more problematic for Jerilyn Quon is that she has no proof that Chief Scharf said anything to Chief Thuvenall. Both have submitted affidavits indicating that they did not speak to each other about Jerilyn Quon in general or

about her application in particular. (Aff. Lloyd Scharf ¶ 2; Aff. Martin Thouvenell ¶ 2). Her attempts to paper over these glaring omissions in her proof by resort to evidentiary "inferences" in retaliation claims only further demonstrates the paucity of her proof on this claim. To begin with the obvious, what may be sufficient to make out a retaliation claim says very little for an entirely separate cause of action, such as defamation, with its own separate and divergent elements of proof. A retaliation claim does not require that a plaintiff prove what was said or that the defendant said it, but allows proof through inferences to abound as a proper method of marshaling one's evidence. The same cannot be said about a defamation cause of action. Proof that the defendant actually made a statement to someone is critical for liability to attach. *See Scott v. McDonnell Douglas Corp.*, 37 Cal.App.3d 277, 291, 112 Cal.Rptr. 609 (1974) ("as to these latter utterances the complaint fails to allege that these statements were ever published or made known to any third person. Thus an action in defamation would not lie, there being no publication"). That Jerilyn Quon may surmise that a statement must have been made because otherwise she would have gotten the job is not proof that it was so, much less that Chief Scharf was the one who made this hypothesized statement. *Res ipsa loquitor* has no place in defamation claims.

Without such direct proof about what the defamatory comment actually was and that the defendant actually made that comment to someone else, summary adjudication in favor of the defendants is required. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(holding that summary judgment is in order when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

Accordingly, the governmental defendants are **GRANTED** summary judgment with respect to the defamation claim.

### E. CALIFORNIA PENAL CODE SECTION 629.86

Plaintiffs have not filed an opposition to the governmental defendants' argument that their state law claim under California Penal Code § 629.86, which prohibits the interception of wire and electronic communications, is barred as the text messages in question were in electronic stored files. This Court has previously ruled that such a claim is barred as the state statute "is modeled on the federal Wiretap Act and covers interception of wire and electronic communications, not the acquisition of electronically stored communications and the disclosure of such communications as Plaintiffs have alleged." *Quon v. Arch Wireless Operating Co., Inc.*, 309 F.Supp.2d 1204, 1210 (C.D.Cal.2004). This being the law of the case, the governmental defendants are **GRANTED** summary judgment on the section 629.86 claim brought against them by plaintiffs.

Accordingly, for the reasons stated above defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and plaintiffs' motion for partial summary judgment is **DENIED**.

Per the parties' stipulation and the Court's order entered on July 18, 2006, the Pretrial Conference in this case is scheduled for October 23, 2006, at 11:00 a.m., and trial is scheduled for November 7, 2006, at 9:00 a.m.